IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 11, 2022 Session

## STATE OF TENNESSEE v. TOBY MICHAEL HOLMES

**Appeal from the Circuit Court for Grundy County**
**No. 2018-CR-6093  Thomas W. Graham, Judge**

_____

### No. M2020-01539-CCA-R3-CD

_____

A Grundy County grand jury indicted the Defendant, Toby Michael Holmes, for voluntary manslaughter.  A jury convicted him of the lesser-included offense of criminally negligent homicide.  The Defendant sought judicial diversion.  The trial court denied judicial diversion and sentenced the Defendant to three years of probation, with 1,768 hours of community service to be performed at a local drug recovery center.  On appeal, the Defendant asserts that: (1) he was not properly convicted of the lesser-included offense of criminally negligent homicide; (2) the trial court improperly denied judicial diversion; and (3) the amount of community service was excessive.  After review, we conclude that the trial court erred by denying judicial diversion and grant the Defendant's request.  The trial court's judgment is affirmed in all other respects.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part, Reversed in Part; Case Remanded**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT L. HOLLOWAY, JR., JJ., joined.

Clifton B. Sobel, Jr., Murfreesboro, Tennessee, for the appellant, Toby Michael Holmes.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; J. Michael Taylor, District Attorney General; and David L. Shinn, Jr., and Courtney Lynch, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from the Defendant, a Sheriff's deputy at the time, initiating a traffic stop based upon a driver speeding.  When the driver did not stop, a high-speed chase

ensued. After the vehicle stopped, the Defendant exited his patrol car with his service weapon drawn and ordered the driver to exit the vehicle. The driver pointed a gun at the Defendant and drove the vehicle towards the Defendant. As the vehicle sped past, the Defendant jumped behind his patrol car and fired his service weapon into the vehicle's front windshield, driver's side door, and rear windshield, killing the twenty-year-old passenger, Shelby Comer ("the victim"). A Grundy County grand jury indicted the Defendant for voluntary manslaughter.

At trial the parties presented the following evidence: On the night of December 23, 2017, Grundy County Sheriff Clint Shrum responded to B Mine Road in the Flat Branch area. Law enforcement officers were on the scene, but emergency personnel had not yet arrived. Sheriff Shrum noticed a Ford Mustang in a ditch. The car had bucket seats. The victim was lying "in the driver's side front seat. Her front right foot [was] hanging in the door, or on the door. Left foot just hanging down." The victim's head was "[k]ind of . . . hanging toward the console," and her body was "laid back . . . up against the . . . center console."

Sheriff Shrum said that Deputy Ann King arrived at the scene. Deputy King checked the victim for a pulse and got her out of the vehicle. Once on the roadway, Deputy King performed cardiopulmonary resuscitation (CPR) on the victim, but the victim showed no signs of life. Shortly thereafter, the paramedics arrived at the scene.

Sheriff Shrum identified his office's "Use of Force and Deadly Force Policy." He read the following excerpt from the Law Enforcement Policies and Procedures document:

Use of Deadly Force:
Deadly force may not be used under the following circumstances:

1. As a warning or threat;

2. With the intent to maim or cripple a person;

3. On a person who has not caused or threatened to cause serious bodily injury or death to another person, including the officer;

4. On a person who simply flees or evades arrest;

5. At or from a moving vehicle, except in exigent circumstances, and only in an attempt to save human life;

6. Merely to prevent the destruction or theft of property; or

7. When the officer has any doubt as to the justification for using deadly force.

Sheriff Shrum also identified the Defendant's signed receipt for the Grundy County Sheriff's Office Policy and Procedures Manual. The Defendant signed the document on May 23, 2017, acknowledging that he agreed to read and know the policies and procedures.

The State entered into evidence the Incident Report the Defendant completed on December 26, 2017, identifying the driver of the Mustang and the victim. Sheriff Shrum read the narrative written by the Defendant in the Incident Report as follows:

On December 23, 2017, I, Deputy Mike Holmes, was on routine patrol at Coalmont Elementary School when I heard a vehicle on Highway 56 accelerating at a high rate. I saw a dark colored Ford Mustang come pas[t] the school at a very high rate of speed. I pulled on to Highway 56 and attempted to get a visual on the vehicle. On the highway in front of the Coalmont . . . EMS station I made visual contact with two sets of tail lights. The first car that I came in contact with was a white Toyota four door car. I activated my emergency equipment and passed that vehicle in an attempt to catch up to the other vehicle. Around Roddy Springs Road I caught up with a dark gray Ford Mustang displaying Tennessee license plate 8G86V5 traveling around 70 miles per hour. I activated my emergency equipment. The vehicle did not stop. At Q Switch Road the vehicle slowed down in what I thought was an attempt to stop. The vehicle accelerated after turning and was unable to maintain control or stay in their lane of travel. The vehicle appeared to be occupied with two people. When the vehicle got to the intersection of Q Switch Road and Flat Branch Road it stopped approximately twenty five yards from the intersection and then accelerated again. The vehicle then turned left on to Flat Branch Road. The vehicle then turned onto B Mine Road and was unable to maintain control of the vehicle. We proceeded up the hill on B Mine Road. Approximately halfway up the hill on B Mine Road the vehicle pulled to the right into the grass. I exited my patrol vehicle in a traffic stop. The vehicle accelerated again and turned around facing right at me. I drew my service weapon and pointed it at the driver of the vehicle. I ordered the occupants to show their hands and stop the vehicle. The driver then aimed a silver handgun at me over the steering wheel. I fired my weapon at the driver. The vehicle then started to accelerate towards me. I stepped in front of my vehicle and fired at the driver's side door of the vehicle as it went pas[t] me. The vehicle then struck my patrol car and rolled down the driver's side of the vehicle. It then accelerated off. . . . I stepped from the front of my patrol car and fired at the rear window of the car, at the driver's side. After firing once at the rear of the vehicle, Deputy

- 3 -

T.J. Bean was coming up the hill, so I didn't fire again. The Mustang hit Deputy Bean's car on the driver's side and went through the ditch. After turning my vehicle around and attempting to catch up to the vehicle I could not see taillights. Deputies Bean, Payne, Young and myself searched the area looking for the vehicle. At that time a perimeter was set up at the ends of B Mine Road and Flat Branch Spur. Two vehicles were allowed through the perimeter, one was a resident and one who was in the area to pick up his daughter from a residence. Approximately fifteen minutes after the initial contact a subject called 911 and advised that there was a car in the ditch on B Mine Road and a male subject had approached him stating he had 'been shot and needed a ride.' Units left the perimeter and went in search of the subject. At the bottom of the hill on B Mine Road myself, Deputy Bean, Chief Deputy Tony Bean, Constable Chris Boyd and his wife Ann found the Mustang on the left side of the road in a deep ditch full of water. The driver's door was open and a female was laying [sic] in the front driver's seat with her right leg laying on the window's door sill. The female was removed from the vehicle and CPR was began. Grundy EMS Medic 3 arrived, loaded the female in their unit and left. Additional deputies arrived on the scene and began to search for the male subject in the vehicle, later identified as Jacky Wayne Bean, (date of birth 3/21/85). Mr. Bean is charged with attempted first degree murder, felony evading, three counts of reckless endangerment, driving under the influence, violation of implied consent, driving on revoked and felon in possession of a firearm.

The Defendant completed a Supplemental Report on December 28, 2017, that provided:

During the initial portion of this pursuit I attempted to activate my body worn camera. It would not activate. After this incident was over I tested my camera and the battery was not seated in the housing correctly. I reseated the battery and the camera booted up.

Sheriff Shrum testified that the Defendant began working part-time for the Sheriff's Department on July 3, 2017, and was still working part-time on December 23, 2017. Sheriff Shrum confirmed that a deputy must have been "POST certified" before they could be employed full-time. To do so, one must have successfully attended the Tennessee Law Enforcement Training Academy, finished over 491 hours of training, and obtained the approval of the Peace Officers of the State of Tennessee ("POST") Commission. Potential full-time deputies had six months to become POST certified but could work part-time indefinitely if they never became POST certified. Sheriff Shrum stated that, at the time of this incident, the Defendant was not POST certified.

- 4 -

On cross-examination, Sheriff Shrum stated that the Defendant had thirteen years of experience in various law enforcement offices before working in his office. He said that the Defendant's part-time status was due to "budget concerns." During his employment with the Grundy County Sheriff's Department, the Defendant completed eighty hours of in-service training in ten months. Sheriff Shrum confirmed that he viewed the Defendant as one of his "finest deputies." Following the shooting, Sheriff Shrum decommissioned the Defendant as a patrol officer but continued to employ the Defendant as an evidence custodian.

Jimmy Ryan, a resident of B Mine Road, drove home from work on the evening of December 23, 2017, and was met by law enforcement officers at the beginning of B Mine Road. After questioning, law enforcement permitted Mr. Ryan to drive home on B Mine Road. As he drove down the road, he noticed a car "s[i]tting off in the swamp with a foot sticking out of the driver's side window." Mr. Ryan stopped in the middle of the road "to see what [was] going on," and his passenger door "was swung open." A man stood inside the open car door and told Mr. Ryan that he had been shot. The man, later identified as Mr. Bean, the driver of the Mustang, asked Mr. Ryan to "take him out of there." Mr. Ryan declined and asked the man to step away from his vehicle. The man complied. Mr. Ryan drove up the road approximately 1000 feet and then pulled over to call 911.

The Grundy County 911 Center Director Wanda McDaniel provided a recording of the 911 call and the CAD generated incident report from December 23, 2017. Ms. McDaniel explained that a CAD report was a "computer generated report" and that 911 began a CAD report each time an officer called in with information related to a possible violation of the law, such as a traffic infraction. Ms. McDaniel explained that the CAD system recorded all communication related to an incident such as phone calls or officers speaking through the radio system. The State played a recording of all of the "radio traffic" between the officers at the scene. The CAD report indicated that the first call identifying the Mustang was at 10:33 p.m. Ms. McDaniel explained that when an officer saw a traffic violation, they "radio[ed] it in." At 10:33 p.m., the Defendant reported, "He is going 45." Ten seconds later, the Defendant reported, "He is all over the road." Approximately three minutes after the initial report, the Defendant advised, "[S]hots fired." These statements were documented on the report and could be heard on the recorded radio calls. A minute later, the Defendant placed a radio call indicating that the vehicle was driving "back towards Q Switch." The Defendant advised that the driver had pointed a gun at the Defendant and that the Defendant had fired his weapon. The Defendant advised that there were two occupants of the vehicle and that the occupant of the passenger's seat as possibly female. He reported that the driver's gun was "chrome looking."

Paramedic Tyler King responded to the December 23, 2017 call, arriving at 11:05 p.m. He observed a Mustang in the ditch line. Due to the unsafe nature of the scene, he did not look at the car. He found a young female lying in the middle of the highway. She

was unresponsive, she did not have a pulse, her pupils were fixed and dilated, and she was not breathing. Law enforcement officers were performing "high-quality" CPR. Mr. King estimated that the victim had been dead for less than an hour. Mr. King described the treatment administered on the drive to the hospital, noting that he did not see blood or a gunshot wound on the victim's body.

Kevin Campbell, who lived on Big Mine Road,[1] testified that at around 9:00 p.m. on December 23, 2017, Mr. Bean and the victim arrived at his home in a Mustang. He had known Mr. Bean for about six to eight months. Mr. Campbell estimated that Mr. Bean stayed at Mr. Campbell's home approximately an hour and twenty minutes, during which time the victim remained in the car. At around 10:13 p.m., Mr. Campbell spoke to the victim in the Mustang as she and Mr. Bean prepared to leave. While at Mr. Campbell's residence, Mr. Bean had a Hi-Point .380 pistol. Mr. Bean carried the gun "tucked in the front of his pants"; however, when he laid it on the table, Mr. Campbell observed that the gun was "all to pieces" because Mr. Bean had "broke it down" and "the springs went ever which way." Mr. Campbell testified that he was familiar with how to take a pistol apart and put it back together and that, in his opinion, Mr. Bean's gun was not usable. Mr. Campbell explained that Mr. Bean had lost the spring for the firing pin, so, even had he successfully reassembled the gun, it would not have fired. Mr. Campbell attempted to help Mr. Bean put the gun back together, but, with the missing spring, there was nothing he could do. After the two men worked on the gun, Mr. Bean put the gun back in his pants.

Tennessee Bureau of Investigation ("TBI") Special Agent Mark Wilson testified that he arrived at the crime scene at 1:07 a.m. on December 24, 2017. After speaking with Special Agent Chip Andy and Sheriff Shrum, Special Agent Wilson began processing the scene according to the TBI policy for officer-involved shootings. Special Agent Wilson photographed the Defendant and then conducted a recorded interview with him.

Mr. Bean testified that he had prior felony convictions and, at the time of trial, a pending probation violation. He explained that most of his criminal history could be attributed to his "problem" with methamphetamine. Mr. Bean recalled that on the day of the incident, he was in Winchester with the victim, who was "kind of" his girlfriend. He traded methamphetamine to "rent" the Mustang. Mr. Bean drove the victim to Grundy County to retrieve some of her belongings from a residence there. They then went to Mr. Campbell's house on Big Mine Road to retrieve some of Mr. Bean's clothes. Mr. Bean went inside Mr. Campbell's house while the victim remained in the car. He estimated that he was in Mr. Campbell's house approximately thirty minutes. Mr. Bean denied having a gun when he entered Mr. Campbell's home.

---

[1] Although the street names are similar, B Mine Road and Big Mine Road are different streets.

Mr. Bean testified that the victim was alive when they left Mr. Campbell's house. They drove up "to the junction" to get something to eat, but the victim decided that nothing there appealed to her. They decided to return to Winchester. Mr. Bean confirmed that he had used methamphetamine before he left Mr. Campbell's house. He recalled that the victim had used methamphetamine earlier in the day but not while at Mr. Campbell's house. As he drove away from the L & L Market, a police officer attempted to make a traffic stop. Mr. Bean did not comply.

Mr. Bean explained that he did not stop his vehicle because he did not have a driver's license and did not want to go to jail. When he turned onto B Mine Road, the victim told him that the road was a dead end. After passing a "curvy part" of the road, he saw a grassy area large enough to attempt a U-turn. When he did so, the police officer blocked him. Mr. Bean put his foot on the brake, and the Defendant exited his service vehicle while firing his gun. Mr. Bean denied having a gun in his hand. He also denied that the victim had a gun, saying that the victim was holding an eleven-week-old puppy in her lap. The Defendant's first shot hit the windshield and did not strike either Mr. Bean or the victim. Mr. Bean ducked down, and when the gunfire continued, he "tried to get out of there." Mr. Bean could not see where he was driving because he was seated down low to avoid the gunfire. He denied trying to run over the Defendant. He "vaguely" remembered hitting the side of the police car as he attempted to drive away. After he hit the Defendant's vehicle, he heard the victim scream, "I've been shot." He told her he would take her to the hospital, but, as they passed another law enforcement vehicle on the road, the Mustang's headlights went out, Mr. Bean missed the curve in the road, and he drove off the side of the road into a ditch.

Mr. Bean testified that when they crashed, the victim was screaming. He exited the vehicle, and the victim crawled over the center console to get out through the driver's side door. After the victim climbed out of the vehicle, she went "limp," and Mr. Bean caught her. When he could not get the victim to respond, he placed her back in the driver's seat. A car stopped on the road, and Mr. Bean approached, asking the man for help, but the man declined. Mr. Bean walked a hundred to a hundred and fifty yards into the woods and lay down. He explained that he left the victim in the Mustang out of fear that the officers would shoot him if they found him. Around daylight, Mr. Bean heard someone nearby, and he "raised up." The police saw him and took him to Sewanee Hospital. Mr. Bean did not remember much about the hospital stay.

Tennessee Bureau of Investigation ("TBI") Special Agent Elizabeth Williams reported to the hospital to photograph the victim's body. She first spoke with hospital personnel who did not mention a gunshot wound. As Special Agent Williams examined and photographed the body, she found a gunshot wound on the victim's left side. The doctor returned to the room and indicated that the wound could be a gunshot wound and that "particles" on the X-rays could be bullet fragments; however, they would have to "wait

to see." She collected an orange shirt and a grey shirt from the victim for analysis. Special Agent Williams also attended the autopsy.

Special Agent Williams spoke with Mr. Bean the day after the shooting. He was in the hospital, lying on a bed in a "a state of semi-asleep." Medical personnel informed Special Agent Williams that no medication had yet been administered to Mr. Bean. Special Agent Williams recalled that Mr. Bean answered her questions appropriately but that at times, he was difficult to hear, and she had to repeat her questions. She stated that Mr. Bean cried several times during the interview as they spoke of the victim's death.

TBI Special Agent Laura Boos testified as an expert in DNA. Special Agent Boos reported to the scene and photographed and collected thirteen cartridge cases, glass, paint, and plastic fragments for further analysis. Law enforcement also found a syringe in the grass near the Mustang and a shoe and a hat between the Mustang and the roadway. Special Agent Boos noted from photographs that several holes were in the Mustang and that the windshield and taillight were damaged. She also photographed the Defendant's vehicle, noting some damage but stating that the vehicle did not appear to be "severely damaged." She described "some scratches down the side."

Special Agent Boos swabbed several areas inside the Mustang and tested those swabs. The presumptive tests did not indicate the presence of blood. A substance collected from the driver's seat, although not blood, matched the victim's DNA sample. Another swab collected from the Mustang's dashboard tested positive for the presence of blood, and the DNA matched the victim's known DNA sample. The syringe that was collected at the scene was swabbed and analysis revealed DNA that matched the victim's known DNA profile. A grey jacket with a red substance on it was collected, and the red substance tested positive for the presence of blood. The DNA profile from the substance on the jacket matched the victim's known DNA profile. Special Agent Boos also tested the two shirts collected at the hospital. Multiple areas on both shirts tested positive for the presence of blood.

TBI Special Agent Jessica Hudson examined the fired .357 SIG caliber cartridge cases recovered at the scene and the Defendant's Glock .357 SIG caliber pistol. Special Agent Hudson identified "bullet fragments, copper jacket fragments or lead fragments" recovered from the Ford Mustang. Special Agent Hudson microscopically compared the cartridge cases, bullet, and bullet fragments with fired cartridge cases and bullets from the Glock .357 SIG caliber pistol. All of the cartridge cases recovered at the scene were fired from the Glock pistol. As to the bullet fragments and bullets, some bore all the same characteristics as the Glock pistol, and some bore no markings of comparison value.

Special Agent Hudson also examined the Mustang. She found nine holes, consistent with bullet holes, on the outside of the vehicle. One bullet hole was in the driver's side

windshield, and four holes were in the driver's door. Another hole was in the driver's side taillight; the bullet traveled through the trunk, through back seat, and into the back of the passenger's seat. Two holes were in the rear bumper. One hole was in the license plate; the bullet perforated the trunk and entered the rear passenger's wheel-well area. The bullet recovered from the victim's body shared the same class characteristics as the Defendant's service weapon.

TBI Special Agent Kyle Osborne tested Mr. Bean's jacket and found the presence of gunshot primer residue. He also examined glass from the penetrating impact on the Mustang's windshield. Examination revealed one penetrating impact through the windshield and that the force that caused the impact moved from the exterior of the vehicle toward the interior side of the windshield.

TBI Special Agent Randall Nelson compared fragments of glass found on Mr. Bean's jacket with glass standards collected from the rear and driver's window of the Mustang. The glass recovered from Mr. Bean's jacket matched the glass standard from the rear window.

TBI Special Agent Joseph Castelbuono testified that he worked as a toxicologist and that he analyzed Mr. Bean's blood sample. The blood sample revealed methamphetamine at 0.63 micrograms per milliliter and amphetamine, present when the body metabolizes methamphetamine, at .06 micrograms per milliliter. He explained that methamphetamine was a potent stimulant that caused the average person to experience jitteriness, paranoia, and aggression. It could cause a person to engage in adverse risk behaviors.

Dr. Randy Tashjian, a forensic pathologist, testified that he performed the autopsy in this case. Dr. Tashjian found a gunshot wound on the left side of the victim's back. Dr. Tashjian testified that a wound looked differently if inflicted post-mortem. The color and appearance of an injury inflicted before death were different due to the heart beating and blood pressure. The gunshot wound in this case had an appearance consistent with an injury inflicted before death.

About the victim's injuries related to the gunshot wound, Dr. Tashjian testified that he found bleeding in the body cavities and injuries to the left lung, left side of the diaphragm, the spleen, left kidney, colon, ascending colon, and the aspiration of blood into the airways. Dr. Tashjian collected the bullet that was lodged in the victim's ascending colon. Dr. Tashjian testified that the victim's cause of death was a gunshot wound to the torso. Dr. Tashjian collected blood from the thoracic cavity and sent it to a laboratory for testing. The testing of the victim's blood revealed the presence of methamphetamine, "metabolite methamphetamine," and cannabinoids. Dr. Tashjian considered the toxicology report when determining the cause of death and concluded that the victim did not die due

to an overdose. Dr. Tashjian opined that the injuries the victim sustained would not have caused instantaneous death nor would they have incapacitated her.

The State concluded its case-in-chief, and the Defendant presented the following evidence: Senior Alabama State Medical Examiner Edward A. Reedy viewed a photograph of the bullet recovered from the victim's body. He described the bullet as "intact, but slightly deformed." He reviewed the autopsy report and the photographs taken during the autopsy. He generally agreed with the findings in the autopsy report except that he believed there was "maybe a misstatement" regarding the bullet path and there were no measurements of the defects in the injured organs. He said that measurements would have provided more information on how profusely the victim may have bled after sustaining the injury and would have confirmed the actual wound path.

Dr. Reedy thought the autopsy procedure was done adequately, but he disagreed with the cause of death. Based upon the toxicology report, he believed the victim died prior to the shooting from a drug overdose based upon the 3,400 nanograms per milliliter of methamphetamine present in the victim's blood. Dr. Reedy testified that he did not believe there was a significant amount of blood found in the chest cavity to support a finding that the victim "bled out" due to the gunshot wound. He said that normally in gunshot wound cases there was a greater amount of blood present. He "presume[d]" the blood in the chest cavity came from the spleen and left kidney which were "highly vascular." He noted that those organs were not photographed, which precluded him from evaluating the severity of the injuries to the left kidney and spleen. He believed that the blood in the victim's abdomen came from the CPR efforts.

Based upon his review of the autopsy documents, Dr. Reedy believed that the victim was dead at the time the bullet entered her body. He stated that the victim's reported level of 3400 nanograms per milliliter was well within the reported fatal range for methamphetamine, which was from 100 nanograms per milliliter to 69,000 nanograms per milliliter. He explained that the reported fatal range was broad to encompass the varying range of reactions to the drug by different people.

On cross-examination, Dr. Reedy agreed that the victim "could have died from that gunshot wound based upon what [he] saw in that autopsy."

Chris Boyd testified that he worked for the Grundy County Sheriff's Department in 2017[2] and reported to the scene with another deputy, Ann King. As one of the first officers to arrive at the scene, Deputy Boyd "cleared the vehicle" to ensure the officers' safety. He recalled that the vehicle was running and that the victim was lying across the driver's side

---

[2] Deputy Boyd testified that, at the time of trial, he worked for "Rogers Group." He also served as a Tennessee constable and volunteered with the fire department and rescue squad.

seat and the console. One of the victim's legs was "across the seat" while the other was "on the door." After Deputy Boyd reported to Sheriff Shrum that the vehicle was "clear" of any weapons, Sheriff Shrum allowed Deputy King to retrieve the victim.

Law enforcement officers moved the victim up the bank of the ditch and onto the road where the deputies began administering CPR. Deputy Boyd had not seen any blood pooling in the car. While administering CPR, Deputy Boyd noticed the victim's skin was pale and "abnormally" cold. He commented to the other deputies that he thought the victim "had been down for some time." The CAD report reflected that the Defendant requested Emergency Medical Services at 11:00 p.m. December 23, 2017.

Ann King worked for the Grundy County Sheriff's Department in December 2017.[3] On the night of December 23, 2017, she and Deputy Boyd were "getting home" when they heard the Defendant on the police radio reporting that he was "in pursuit." She and Deputy Boyd drove to the area to assist. They arrived about the time the sheriff and the Defendant "had showed back up where this car was found." Deputy Boyd cleared the vehicle and then Deputy King retrieved the victim from the car. She surveyed the victim for blood and found none. She described the victim as "cold" and said that the victim's clothing was askew. Deputy King carried the victim to the roadway. The victim's lower half became wet due to the water in the ditch.

On cross-examination, Deputy King agreed that she and Deputy Boyd "just sort of r[o]de around and help[ed] out the police any time when they need[ed] help."

The Defendant testified that, at the time of trial, he worked at the Grundy County Sheriff's Office as an evidence custodian. He also served as the fire chief for Monteagle and worked for a company called Mid-South Emergency Equipment selling fire equipment. He recalled the events of December 23, 2017, saying he was at Coalmont Elementary School ensuring the building was secure since it was Christmas break.

As he was leaving the school, he saw a dark-colored Ford Mustang driving at a high rate of speed on Highway 56. He estimated the vehicle was driving close to 100 miles per hour. He drove onto Highway 56 and caught up with the Mustang near Roddy Springs Road. He described the Mustang as driving "all over the place." When he was within twenty yards of the Mustang, he engaged his emergency equipment, but the Mustang continued driving. The cars continued down Highway 56 until they reached Q Switch Road. The Mustang braked abruptly, turned onto Q Switch Road, and stopped. The Defendant pulled over as well, and the Mustang took off again, fishtailing and leaving

---

[3] Deputy King testified that, at the time of trial, she worked as a manager at Silver Bait, a worm farm. She was also "on" the Beersheba Rescue Squad and the Altamont Fire Department.

- 11 -

black marks on the roadway. As they approached a stop sign, the Mustang again abruptly applied its brakes before accelerating up to the stop sign.

Up until this point the Defendant believed this was likely a drunk driver who was hoping to avoid arrest, but with this second abrupt stop, the Defendant became concerned that this "was probably something a little more serious." The Defendant followed the Mustang as it turned left onto Flat Branch and then as it turned right onto B Mine Road. Knowing that B Mine Road was a dead end, the Defendant assumed the driver, who was later identified as Mr. Bean, was lost. The Mustang pulled off the road into the grass and stopped. The Defendant stopped his vehicle and walked around to the front of his car so he could see into the driver's window of the Mustang. He drew his firearm and ordered the occupants of the Mustang to show their hands. Mr. Bean spun the Mustang around so that it faced the Defendant. The Defendant pointed his gun at Mr. Bean and ordered him to show his hands. The Defendant stated that Mr. Bean sat a gun on the steering wheel. Upon seeing the gun, the Defendant began firing his service weapon.

As the Defendant shot at the Mustang, Mr. Bean drove toward the Defendant who jumped out of the way. As Mr. Bean drove past the Defendant, the Defendant fired at the driver's side door. Mr. Bean hit the driver's side of the Defendant's patrol car and then stopped. The Defendant walked toward the Mustang, and Mr. Bean drove away. The Defendant confirmed that he saw someone in the passenger seat of the Mustang. As the Mustang pulled away from the Defendant, the Defendant could see the emergency lights from the back-up officer driving toward the Mustang, and he could hear a siren. As the Mustang drove away from the Defendant, the Defendant fired into the rear of the Mustang. Mr. Bean did not stop but drove on, hitting the back-up officer, Sergeant Bean's[4] car and then "bounced off and went on down the hill."

The Defendant pursued the Mustang and was unable to locate him initially because he did not see the Mustang's taillights in the ditch. He and Sergeant Bean set up a perimeter to try to contain the occupants of the Mustang. Law enforcement allowed two homeowners through the perimeter. Several minutes later, dispatch reported that it had received a call that a man had flagged down one of the homeowners allowed through the perimeter to ask for a ride to the hospital. Officers then began searching the area for ditches and eventually found the Mustang in a ditch. Deputy King and Deputy Boyd arrived shortly thereafter and retrieved the victim from the car. The Defendant testified that Mr. Bean never fired his gun.

---

[4] Although they share the same surname, it does not appear from the record that there is any relationship between the law enforcement officer, Sergeant Bean, and the driver of the Mustang, Jacky Wayne Bean.

On cross-examination, the Defendant confirmed that he first saw the passenger when the car spun around and was facing him. He did not recall writing in his police report several days after the event that he saw the passenger at the intersection of Q Switch Road and Flat Branch Road. The Defendant agreed that during the preliminary hearing, he testified that, once he saw the gun, he moved to the passenger's side of his patrol vehicle before the Mustang started driving again. He agreed that he had testified that he was "six or seven feet from the driver's side – in the front of [his] vehicle over on the passenger's side" when the Mustang passed and struck his patrol vehicle.

He confirmed that he saw the Mustang hit Sergeant Bean's car. He agreed that he told the TBI agent that Sergeant Bean had attempted to push the Mustang into the ditch and that Mr. Bean accelerated and made it through the ditch. The State introduced conflicting statements made by the Defendant about why his body camera did not work. Some statements indicated that the battery was dead, and others indicated that the battery was not seated properly. In response, the Defendant stated that he did not know whether it was because the battery was dead or not seated properly. The Defendant did not recall how many times he fired into the back of the Mustang, although in one of his statements to law enforcement, he reported shooting "just once." He agreed that he fired into the back of the Mustang more than once and that he "misspoke" if he had said once. He agreed that he told the TBI agent that he had fired fifteen times total.

After hearing this evidence, the trial court granted the Defendant's motion for acquittal on the charged offense of voluntary manslaughter. The trial court, however, allowed the State to proceed on the lesser offenses of criminally reckless homicide and criminally negligent homicide. The jury initially sent a note to the trial court saying that they did not think they were going to be able to reach a verdict. However, after the trial court gave the jury a "dynamite charge," the jury convicted the Defendant of the lesser offense of criminally negligent homicide.

The Defendant filed a motion seeking judicial diversion. After a sentencing hearing, the trial court denied judicial diversion and ordered the Defendant to serve three years of probation, with 1,768 hours of community service. It is from this judgment that the Defendant appeals.

## II. Analysis

On appeal, the Defendant asserts that: (1) he was not properly convicted of the lesser-included offense of criminally negligent homicide; (2) the trial court improperly denied judicial diversion; and (3) the amount of community service was excessive.

### A. Criminally Negligent Homicide

- 13 -

The Defendant contends that the trial court improperly amended the indictment by dismissing the indicted offense but allowing the jury to consider the lesser-included offenses of the indicted offense. He contends that once the trial court dismissed the indicted offense, no greater offense existed from which a jury could conclude that a lesser-included offense had been committed. The State responds the Defendant was properly convicted of the lesser-included offense of criminally negligent homicide. We agree with the State.

The grand jury indicted the Defendant for voluntary manslaughter. Tennessee Code Annotated section 39-11-211 defines voluntary manslaughter as "the intentional or knowing killing of another in a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner." Voluntary manslaughter is a Class C felony. At trial, the trial court found that the evidence did not support a conviction on the charged offense but submitted to the jury the applicable lesser-included offenses. The jury convicted the Defendant of the lesser-included offense of criminally negligent homicide. Criminally negligent homicide requires "[c]riminally negligent conduct that results in death." Criminally negligent homicide is a Class E felony.

An indictment or presentment must provide notice of the offense charged, an adequate basis for entry of a proper judgment, and suitable protection against double jeopardy. *State v. Byrd*, 820 S.W.2d 739, 741 (Tenn. 1991). As a result, a defendant cannot legally be convicted of an offense which is not charged in the indictment or which is not a lesser-included offense embraced in the indictment. *State v. Cleveland,* 959 S.W.2d 548, 552 (Tenn. 1997).

In *State v. Burns*,[5] our supreme court held that trial courts are required to "'instruct the jury on all lesser-included offenses if the evidence introduced at trial is legally sufficient to support a conviction for the lesser offense.'" *State v. Burns*, 6 S.W.3d 453, 464 (Tenn. 1999) (quoting *State v. Langford*, 994 S.W.2d 126, 128 (Tenn. 1999)). As relevant to this appeal, the *Burns* test provides that an offense is a lesser-included if:

> (a) all of its statutory elements are included within the statutory elements of the offense charged; or
> (b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing
> (1) a different mental state indicating a lesser kind of culpability; . . .

*Id*. at 466-67.

---

[5] *Burns* was codified in Tennessee Code Annotated section 40-18-110 and then amended in 2009. In the 2009 version, the language of subsection (b) was omitted. The Tennessee Supreme Court, however, in *State v. Howard*, 504 S.W.3d 260 (Tenn. 2016), determined that the legislature did not abrogate subsection (b).

In this case, criminally negligent homicide includes a different mental state, "criminal negligence," indicating a lesser kind of culpability. Because criminally negligent homicide is a lesser-included offense of the indicted offense of voluntary manslaughter, the Defendant was necessarily charged with criminally negligent homicide. The trial court is required to charge all applicable lesser-included offenses and therefore, did not err by doing so. The Defendant is not entitled to relief as to this issue.

## B. Judicial Diversion

The Defendant argues that the trial court erred when it denied his request for judicial diversion. The State responds that the trial court acted within its discretion when it denied the Defendant's request. Upon *de novo* review, we conclude that the trial court erred. Accordingly, we reverse the denial of judicial diversion and remand for the trial court to grant judicial diversion.

At the Defendant's sentencing hearing, Ray David Comer testified for the State that he was the victim's father and that the Defendant's case was highly publicized in the media. He said that deputies of the Grundy County Sheriff's Department, specifically Tony Bean and T.J. Bean, had been arrested for federal crimes and that those officers' cases had been highly publicized like the Defendant's case. The victim's death affected her family and caused Mr. Comer and the victim's brother to become "standoffish." Mr. Comer explained that his life changed when the victim was killed and that "[a]ny good memories or whatever, good times was before December 23rd. Since then it's just a blank slate, I guess." He said he thought he could have handled the victim's death "a little better" if she had been killed in a car accident but that she had been "murdered." He said the Defendant had not expressed remorse for killing the victim.

Sheriff Shrum testified for the State that the Defendant's case received "[a] lot of regional coverage" in the media and that he released a media statement after the jury convicted the Defendant. In the statement, Sheriff Shrum expressed disappointment that the Defendant "will not be allowed to protect and serve the place he called home," whereas "[the victim] is still dead and the man that assisted her will never be brought to justice." Sheriff Shrum denied that he thought the loss of the Defendant's job with the sheriff's department was more important than the victim's death. He said that based on the evidence at trial, he thought the victim died of a drug overdose, not a gunshot wound.

Sheriff Shrum identified a plea agreement showing that in October 2019, Greg Higgins, a former captain for the Grundy County Sheriff's Department, pled guilty to a federal offense for assaulting a handcuffed arrestee in July 2017. Sheriff Shrum also identified a federal indictment showing that in July 2019, Chief Deputy Tony Bean and his son, T.J. Bean, were indicted for violating the civil rights of an arrestee in December 2017,

while they were employed by the sheriff's department. At the time of the Defendant's sentencing hearing, Tony and T.J. Bean were "on administrative leave with pay." The Defendant was indicted for criminally negligent homicide in November 2018, which was almost a year after the victim's death. Prior to the Defendant's indictment, he remained a sheriff's deputy, and the Grundy County Sheriff's Department paid for him to attend "the academy." The Defendant was "suspended after indictment" pending the outcome of his plea at arraignment. After the Defendant's arraignment, he became a civil employee of the sheriff's department.

On cross-examination, Sheriff Shrum testified that he would have fired his gun at the Mustang if he had seen "somebody throw a gun over the steering wheel and come toward me." The trial court asked if Sheriff Shrum would have fired at the Mustang after it passed him, and he answered, "I wasn't in that situation, you know, Your Honor, but I think based just on the fact that the car come to me I would have returned fire. At some point you understand that there's a retreat and you stop that." Sheriff Shrum acknowledged that although the Defendant fired at the Mustang as the Mustang was leaving the scene, Sergeant Bean was on his way to the site. Sheriff Shrum noted that there were "16 houses in that area as well." On redirect-examination, Sheriff Shrum testified that he would have fired at the Mustang when he saw the gun but that "[i]f the vehicle was passing me, based on what I know in my training I would have had to stop firing."

James Wilson Cowan testified for the Defendant that he met the Defendant at church when the Defendant was nine or ten years old. Mr. Cowan "got to really know" the Defendant as a youth in the church when the Defendant was in junior high school. The Defendant attended Mr. Cowan's Sunday School class, participated in the church's youth organization, and was a member of the high school band. The Defendant was respectful, truthful, and "a good kid." The Defendant was an Eagle Scout and earned a college degree, and he and his father built a house for Mr. Cowan. The Defendant had a "very good reputation" in the community, worked for the rescue squad and the fire department, and was elected to the school board. Mr. Cowan said he had never talked with the Defendant about the facts of this case. However, Mr. Cowan and the Defendant communicated via text messages, and Mr. Cowan tried "to give him some encouragement." On cross-examination, Mr. Cowan testified that he did not attend the Defendant's trial but that he probably read about the facts of the case in the newspaper.

Beverly Holmes testified that she and the Defendant were married for nine years and that they divorced in 2009. They had one son, who was sixteen years old at the time of sentencing. Ms. Holmes said that she had been a school teacher for twenty-two years and that she was able to attend only one day of the Defendant's trial. Ms. Holmes and the Defendant met when they were in the eighth grade, started dating when they were seventeen years old, and attended college together. She said that although they divorced, they were "good co-parents" and "just really good friends still." Ms. Holmes described the

Defendant as "a hard worker" and said that he was "an involved father when he can be." The Defendant also had a younger son and was "a really great father to his little one." Ms. Holmes said that the Defendant was an honest person and that he was current on his child support payments. She stated that the Defendant changed after the shooting and that "I feel that it's taken a toll on him, because he's so remorseful about it. He hates that a life was taken." The Defendant "seemed more withdrawn" and "[n]ot as outgoing" after the shooting.

On cross-examination, the State asked Ms. Holmes if she ever told anyone that the Defendant was a "liar" or "dishonest." At first, Ms. Holmes said no. However, she later acknowledged making those statements and explained, "In some form or fashion we've all lied."

The Defendant gave an allocution in which he apologized to the victim's family for "taking" the victim's life and said he never intended to kill anyone. The Defendant stated that he had sole custody of his three-year-old son and that "[i]f I've ever had a regret in my life, it's making that decision to pursue that Mustang that night." He stated that he should have discontinued the pursuit, blocked the road, and waited for additional officers to arrive. The Defendant said he was responsible for "the changes" in the victim's family, in his own family, and in Grundy County and that he was "truly sorry."

The State introduced the Defendant's presentence report into evidence. According to the report, the Defendant was forty-three years old and lived with his girlfriend and young son from a previous relationship. The Defendant stated in the report that after he graduated from high school, he attended Middle Tennessee State University and earned a Bachelor of Science degree. The Defendant also stated in the report that his parents provided him with a "stable, disciplined and loving home" and that his relationship with his family was "close and strong." He said that he had a "good" relationship with his ex-wife and that she attended every day of his trial. The Defendant described his mental and physical health as "excellent" but said that he suffered from diabetes, that he had to have stents implanted in his heart due to complications from two heart attacks, and that he had been prescribed several medications. The Defendant said that he first consumed alcohol in 1992 and that he consumed one beer "occasionally." At the time of the presentence report, the Defendant had been employed by Mid-South Emergency Equipment since 2018. Prior to working for Mid-South, he worked as a salesman for Motorola from March 2012 to March 2014, as a salesman for Safe Industries from March 2014 to April 2018, as a firefighter for Monteagle Voluntary Fire Department from 2016 to 2020, and as a deputy for the Grundy County Sheriff's Department from 2016 to 2020. The report did not show any criminal history for the Defendant.

The Defendant's Strong-R assessment classified his overall risk to reoffend as low. The assessment concluded that he had high needs relevant to "Aggression" and specified

that the Defendant "has displayed threatening, aggressive or violent behaviors in the community during his lifetime," that he "has injured someone with a weapon at some point in his/her lifetime," and that his "threatening, aggressive or violent behaviors have been motivated by conflict or stress." The assessment concluded that the Defendant had low needs relevant to "Friends," "Attitudes/Behaviors," "Mental Health," "Alcohol/Drug Use," "Residential," "Family," "Employment," and "Education."

The State argued that the Defendant's amenability to correction weighed against granting judicial diversion because the Defendant maintained until sentencing that he was not responsible for the victim's death, which showed he lacked remorse, and because "his story evolved and changed," which reflected poorly on his credibility. The State also argued that the circumstances of the offense weighed against granting judicial diversion because the Defendant was not in danger when he fired into the driver's window of the Mustang and because he continued to fire his gun into the back of the car after it passed him. The State acknowledged that the Defendant's social history weighed in favor of granting judicial diversion but asserted that his physical and mental health did not. The State noted that the Defendant had suffered two heart attacks and opined that because he described his mental health as "excellent" in the presentence report, the victim's death had not affected him. The State also asserted that general deterrence did not support granting judicial diversion because "the sheriff's department thinks it's a sad day if you can't shoot somebody in [the] back to fight the war on drugs." The State then referred to the federal cases involving Greg Higgins, Tony Bean, and T.J. Bean and stated, "That is a culture that, apparently, is permeating -- was happening in this community and it screams for deterrence, and denial of a judicial diversion." Finally, the State argued that judicial diversion would not serve the interest of the public as well as the Defendant because "it's necessary for the public to know that you can't go around beating up people who are in custody, you can't go around shooting people in the back."

Defense counsel contended that the trial court should grant judicial diversion, arguing that the trial court should not punish the Defendant for Sheriff Shrum's thoughts about this case and because the Defendant did not have anything to do with the federal cases. Defense counsel noted that the Defendant was an Eagle Scout, did not have a criminal record, never tried to deceive the court, and expressed remorse. Defense counsel argued that although the victim's death was a "tragic loss," the Defendant "was facing a serious credible threat to the safety of this community" and to himself when he shot into the Mustang.

The trial court stated that it was not going to "condone something that was a bad mistake and was a mistake that a jury of this county found to be criminal" and that granting diversion in this case "would ultimately be no offense whatsoever." The trial court denied judicial diversion based on two factors: the deterrence value to the Defendant and others and whether judicial diversion would serve the interests of the public as well as the

- 18 -

defendant. The trial court found that deterrence to the Defendant and to the law enforcement community was needed because although Jacky Bean should not have fled from the Defendant, "nobody should use a gun for the purpose of stopping someone at all costs," particularly when an innocent person could be shot. The trial court further stated that "the issue of killing someone in the process of making an arrest is not a good thing" and that "I think our society now realizes that." The trial court stated that the circumstances, the role of law enforcement in our communities, and "current events" related to killing someone in the process of an arrest supported a finding that granting judicial diversion would not serve the interests of the public.

The trial court stated that it did not think the Defendant "would do it again, because he realizes what happens when you don't think or when you act out of anger." The trial court also stated that the Defendant "might be qualified" for judicial diversion based on the other factors but that either the factor for deterrence or the factor for whether judicial diversion would serve the interests of the public as well as the Defendant justified denying diversion in this case. The trial court stated that "machoism" may have played a role in the Defendant's decision to chase the Mustang and that the Defendant "should never have been alone in a vehicle with full authority to shoot somebody" when he was not a fully trained officer. Accordingly, the trial court denied the Defendant's request for judicial diversion.

"Judicial diversion" is a reference to the provision in Tennessee Code Annotated section 40-35-313(a) (2019) for a trial court's deferring proceedings in a criminal case. *See* T.C.A. § 40-35-313(a)(1)(A). Although judicial diversion is not a sentence, pursuant to such diversion, the trial court places the defendant on probation "without entering a judgment of guilty." *Id*. To be eligible or "qualified" for judicial diversion, the defendant must plead guilty to, or be found guilty of, an offense that is not "a sexual offense or a Class A or Class B felony," and the defendant must not have previously been convicted of a felony or a Class A misdemeanor. T.C.A. § 40-35-313(a)(1)(B)(i)(b), (c). Diversion requires the consent of the qualified defendant. T.C.A. § 40-35-313(a)(1)(A). "[A] 'qualified' defendant is not necessarily entitled to diversion. Whether to grant judicial diversion is left to the discretionary authority of the trial courts." *State v. King*, 432 S.W.3d 316, 326 (Tenn. 2014).

Once a defendant is deemed eligible for judicial diversion, the trial court must consider several factors when deciding whether to grant judicial diversion: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; (6) the deterrence value to the defendant and others; and (7) whether judicial diversion will serve the interests of the public as well as the defendant. *State v. Electroplating, Inc*., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996); *State v. Bonestel*, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993), *overruled on other grounds by State v. Hooper*, 29 S.W.3d 1, 9-

10 (Tenn. 2000). The trial court may consider the following additional factors: "'[the defendant's] attitude, behavior since arrest, prior record, home environment, current drug usage, emotional stability, past employment, general reputation, marital stability, family responsibility and attitude of law enforcement.'" *State v. Washington*, 866 S.W.2d 950, 951 (Tenn. 1993) (quoting *State v. Markham*, 755 S.W.2d 850, 852-53 (Tenn. Crim. App. 1988) (citations omitted)). A trial court must weigh all of the required factors in determining whether to grant judicial diversion. *Electroplating, Inc.*, 990 S.W.2d at 229 (citing *Bonestel*, 871 S.W.2d at 168). Additionally, "a trial court should not deny judicial diversion without explaining both the specific reasons supporting the denial and why those factors applicable to the denial of diversion outweigh other factors for consideration." *Id.* (citing *Bonestel*, 871 S.W.2d at 168).

Generally, "[s]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). Although judicial diversion is not a sentence, our supreme court determined that the standard of review expressed in *State v. Bise* applies to "appellate review for a trial court's sentencing decision to either grant or deny judicial diversion." *King*, 432 S.W.3d at 325. Importantly, however, the court emphasized that the adoption of the *Bise* standard of review "did not abrogate the requirements set forth in *Parker* and *Electroplating*, which are essential considerations for judicial diversion." *King*, 432 S.W.3d at 326.

The trial court need not provide a recitation of all the applicable "factors when justifying its decision on the record in order to obtain the presumption of reasonableness," but "the record should reflect that the trial court considered the *Parker* and *Electroplating* factors in rendering its decision and that it identified the specific factors applicable to the case before it." *King*, 432 S.W.3d at 327. When the trial court considers each of the factors enumerated in *Parker* and weighs them against each other, placing its findings in the record, as required by *Electroplating, Inc.*, we "apply a presumption of reasonableness," per *Bise*, and will "uphold the grant or denial so long as there is any substantial evidence to support the trial court's decision." *Id.* When "the trial court fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." *Id.* Instead, "the appellate courts may either conduct a de novo review or, if more appropriate under the circumstances, remand the issue for reconsideration. The determination as to whether the appellate court should conduct a de novo review or remand for reconsideration is within the discretion of the reviewing court." *Id.* at 328.

- 20 -

Turning to the instant case, we conclude that the record does not sufficiently reflect that the trial court considered all of the applicable factors. The trial court never mentioned *Parker* or *Electroplating* and did not refer to the seven factors outlined by *Electroplating* that the court was required to consider. The trial court did not address the Defendant's social history, his physical or mental health, or his lack of a criminal record. The trial court also did not mention certain social factors, such as the Defendant's graduating from high school and college, his being an Eagle Scout, and his history of employment, which were worthy of consideration. Therefore, we will review the trial court's denial of judicial diversion *de novo*.

Because the parties do not dispute that the Defendant qualifies as a candidate for judicial diversion, we turn to the *Parker* and *Electroplating* factors. First, the Defendant expressed remorse for the victim's death and said he should have stopped the pursuit, blocked the road, and waited for backup officers to arrive. Therefore, in our view, the Defendant's amenability to correction weighs in favor of granting judicial diversion.

As to the circumstances of the offense, the proof at trial showed that on the night of the crime, Jacky Bean used methamphetamine, drove a vehicle, was weaving "all over the road," and fled from the Defendant when the Defendant tried to stop him for speeding. The only reasons Mr. Bean gave at trial for initially refusing to stop for the Defendant was that he did not have a driver's license and did not want to go to jail. The proof at trial further showed that Mr. Bean possessed a gun when he made the U-turn at the end of B Mine Road. Mr. Bean brandished the gun at the Defendant, and the Defendant fired at the Mustang, striking the windshield. Instead of stopping for the Defendant, Mr. Bean ducked down and sped toward him. The Defendant fired at the Mustang again, striking the driver's window as the Mustang passed him. At that point, Mr. Bean could have stopped the Mustang, and neither he nor the victim would have been injured. Instead, he struck the Defendant's patrol car and sped away toward Deputy Bean. We note that the duration of this incident, from the time the Defendant first encountered the Mustang until he fired the final shots into the vehicle, was just five minutes. The duration of the incident on B Mine Road was much less than five minutes.

Nevertheless, we acknowledge that the Defendant fired into the back of the Mustang as Jacky Bean tried to leave the scene and that Sheriff Shrum testified the Defendant should not have fired into the rear of the car. Moreover, the jury concluded that the victim died as a result of being shot by the Defendant, not from the amount of methamphetamine in her system. The trial court stated that it was not going to condone the Defendant's "bad mistake" by granting judicial diversion. However, the Defendant's firing into the Mustang and striking the victim are already incorporated into the elements of criminally negligent homicide. *See* T.C.A. § 39-13-212(a); *State v. Chyanne Elizabeth Gobble*, No. E2014-01596-CCA-R3-CD, 2015 WL 12978645, at \*10 (Tenn. Crim. App. Aug. 12, 2015). The

trial court also stated that granting judicial diversion "would ultimately be no offense whatsoever." As this court has explained, though,

> When a defendant is granted judicial diversion, he or she is placed on probation and must comply with all the conditions of probation, including supervision by a probation officer. Only when the defendant successfully completes probation will the charges be dismissed and the defendant can seek to have his or her record expunged. T.C.A. § 40-35-313(a)(2). If the defendant violates the terms of probation, the trial court can "enter an adjudication of guilt and proceed as otherwise provided." *Id.* Judicial diversion is not a lack of consequences for one's actions, but a one-time opportunity for certain defendants to avoid a permanent criminal record. Anyone who squanders that opportunity by violating the conditions of probation will be held accountable.

*Id.* In our view, the circumstances of the offense weigh in favor of the Defendant.

As to the Defendant's social history and physical and mental health, the Defendant is divorced but is a good father to his teenage son and younger son and is current on his child support payments. He also has sole custody of his young son. The Defendant is an Eagle Scout; graduated from high school; earned a four-year college degree; was elected to the school board; served as a volunteer fireman; does not use illegal drugs or abuse alcohol; and has maintained employment, even after his arrest in this case. He has a cordial relationship with his ex-wife, and he reported that he has a strong and close relationship with his family. Despite his medical issues, the Defendant described his physical and mental health as excellent. Therefore, the Defendant's social history and physical and mental health weigh in favor of granting judicial diversion.

As to the deterrence value to the Defendant and others, the trial court said it did not think the Defendant would repeat his actions. The trial court also said that "nobody should use a gun for the purpose of stopping someone at all costs." In our view, though, the facts of this case are unique in that Jacky Bean consumed an illegal substance, got behind the wheel of a motor vehicle, fled from a police officer who tried to make a legitimate traffic stop of a car traveling almost one hundred miles per hour, brandished a firearm at the officer, drove erratically, and struck the officer's patrol car as he fled from the officer.

As to the final factor, the trial court found that it weighed against judicial diversion because "current events related to killing someone in the process of an arrest supported a finding that a grant of judicial diversion would not serve the interests of the public." The trial court did not elaborate on what it meant by "current events." As this court has quoted from our supreme court,

Judicial knowledge upon which a decision may be based is not the personal knowledge of the judge, but the cognizance of certain facts the judge becomes aware of by virtue of the legal procedures in which he plays a neutral role. No judge is at liberty to take into account personal knowledge which he possesses when deciding upon an issue submitted by the parties. In other words, "[i]t matters not what is known to the judge personally if it is not known to him in his official capacity."

*State v. Kalandra Lacy*, No. W2016-00837-CCA-R3-CD, 2017 WL 1969764, at *5 (Tenn. Crim. App. May 12, 2017) (quoting *Vaughn v. Shelby Williams of Tenn., Inc.*, 813 S.W.2d 132, 133 (Tenn. 1991) (citations omitted)). There is no evidence in the record to support the trial court's conclusion that current events related to the death of an arrestee supports denying judicial diversion in this case. *See id.*

The trial court also seemed to rely on its conclusion that the Defendant "should never have been alone in a vehicle with full authority to shoot somebody" when he was not a fully trained officer. However, Sheriff Shrum testified at trial that the Defendant had thirteen years of law enforcement experience prior to his employment with the Grundy County Sherriff's Department and that the Defendant was not required to be POST certified as a part-time officer. Sheriff Shrum also testified that the Defendant was "put with a supervisor" when he began working for the sheriff's department but that he completed eighty hours of in-service training, which meant POST no longer required that he be supervised. Therefore, the record does not support the trial court's statement. In sum, we conclude that factors (6) and (7) do not weigh against granting judicial diversion. Taking all of the factors into consideration, we conclude that the trial court erred by denying judicial diversion and grant the Defendant's request. We conclude that the Defendant may be placed on judicial diversion for the same period and under the same conditions as were previously imposed regarding the sentence of probation. Accordingly, we will proceed to examine the Defendant's claim concerning his community service hours.

### C. Community Service

The Defendant contends that the trial court abused its discretion by imposing an excessive number of hours of community service. He asserts that 1,768 hours interferes with his employment. The State responds that the trial court properly imposed community service in this case. We agree with the State.

Again, we note that "[j]udicial diversion" is a reference to the provision in Tennessee Code Annotated section 40-35-313(a) for a trial court's deferring proceedings in a criminal case. See T.C.A. § 40-35-313(a)(1)(A). Although judicial diversion is not a sentence, pursuant to such diversion, the trial court places the defendant on probation "without entering a judgment of guilty." *Id.* The Sentencing Act provides that "the trial

court has great latitude in formulating punishment, including the imposition of conditions on probation." *State v. Burdin*, 924 S.W.2d 82, 85 (Tenn. 1996). The primary purpose of probation sentence, however, "is rehabilitation of the defendant," *id*. at 86, and the conditions of probation must be suited to this purpose. "Once the trial judge determines that probation is justified under the circumstances, the conditions imposed must be reasonable and realistic and must not be so stringent as to be harsh, oppressive or palpably unjust." *Stiller v. State*, 516 S.W.2d 617, 620 (Tenn. 1974). The Act does not grant to the trial court "unfettered authority" to impose any condition on the defendant's probation but limits the court's discretion to "the bounds of traditional notions of rehabilitation." *Burdin*, 924 S.W.2d at 87; *see also State v. Mathes*, 114 S.W.3d 915, 918 (Tenn. 2003) (disapproving a probation condition that did "not serve either the goal of rehabilitation or the goal of deterrence); *State v. Robinson*, 139 S.W.3d 661, 666 (Tenn. Crim. App. 2004). That being said, however, the burden of demonstrating the impropriety of a probation condition rests with the defendant. *Burdin*, 924 S.W.2d at 84.

At the sentencing hearing, the trial court acknowledged that it was imposing an "unusually high amount of community service." The trial court continued, explaining,

> I've talked with some folks about this, how [the Defendant] could do some community service that would be of benefit, hopefully to him, but also to the community. So I'm going to require him in the first two years of his probation to work for Blue Monarch, which is a residential recovery unit, on their campus from 8:00 a.m. to 4:30 p.m. every Monday and Tuesday for two years. He is to follow the direction of the president or her designee. But these are young women that have suffered a lot and maybe something that you observe can be helpful to them.

The trial court noted that this arrangement would allow the Defendant to maintain other employment while benefitting young women in their community. The trial court initially considered having the Defendant perform community service on the weekends but staffing issues at Blue Monarch prevented such an arrangement. By assigning the Defendant to serve at this particular facility that serves young women, the trial court hoped "some good will come out of this whole situation." The trial court stated its intention that this condition would also serve as a "statement" to other officers in Grundy County about their duty and service to the community, noting "the idiocy of it all is, I mean, you had his license number, you could have gotten him. . . . [I]f he left you're going to get him, didn't have to stop him." The trial court imposed a total of 1,768 hours of community service based upon the schedule arranged with Blue Monarch.

The trial court imposed a special condition of probation requiring the Defendant to work every Monday and Tuesday at Blue Monarch Women's Rehabilitation Center for the first two years of his three-year probation sentence. Tennessee Code Annotated section

40-35-303(d) permits trial courts to impose conditions of probation that are "reasonably related to the purpose of the offender's sentence and not unduly restrictive of the offender's liberty, or incompatible with the offender's freedom of conscience[.]" *Mathes*, 114 S.W.3d at 918, *see also* T.C.A. § 40-35-303(d)(9). The Defendant was convicted of negligently shooting and killing a twenty-year-old woman in the course of stopping a driver for a traffic violation. The trial court imposed a three-year probation sentence, allowing the Defendant to remain in the community rather than incarceration. The trial court, however, balanced the alternative sentence with a significant community service requirement aimed at the Defendant serving young women in the community. In our view, the special condition imposed complies with the language of *Mathes* and with Tennessee Code Annotated section 40-35-303(d)(9). It also complies with Tennessee Code Annotated section 40-35-303(d)(3), which allows a trial court to order a defendant, without compensation, to perform service to the community.

The Defendant complains that the imposition of 1,768 hours of community service conflicts with his ability to work. There is nothing in the record, however, that indicates how the condition impairs his ability to work. As noted previously, it is the Defendant's burden to demonstrate the impropriety of a probation condition. *Burdin*, 924 S.W.2d at 84. Without any evidence about the Defendant's employment schedule, we cannot conclude that the sentence interferes with his employment. The Defendant is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we conclude that the trial court erred by denying judicial diversion and grant the Defendant's request. The trial court's judgment is affirmed in all other respects.

_____
ROBERT W. WEDEMEYER, JUDGE